IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 20-cv-1034-WJM

UTO THOMAS ESSIEN,

Petitioner,

v.

WILLIAM BARR, Attorney General, U.S. Department of Justice,
MATTHEW T. ALBENCE, Acting Director for Immigration and Customs Enforcement;
CHAD WOLF, Secretary, U.S. Department of Homeland Security; and
JOHN FABBRICATORE, Field Office Director, Enforcement and Removal Operations,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
JOHNNY CHOATE, Warden of the Aurora Contract Detention Facility, in their official
capacities,

Respondents.

_____

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

_____

Uto Thomas Essien ("Essien") is an immigration detainee in the custody of

Defendant U.S. Immigration and Customs Enforcement ("ICE"), being held at the Aurora

Contract Detention Facility ("Facility") in Aurora, Colorado.  He asserts that his medical

conditions make him especially susceptible to a severe case of COVID-19 and so it is

unconstitutional to keep him at the Facility, where he cannot reasonably protect himself

from infection.  He has filed a petition for a writ of habeas corpus under 28 U.S.C. §

2241.  He has also brought the motion currently before the Court, namely, his Motion for

a Temporary Restraining Order, seeking immediate release so he may live at the home

of his sister in Aurora.  (ECF No. 4.)

"Considering the nature of relief requested and the fact that counsel for

Defendants ha[d] already appeared," the Court concluded that a temporary restraining order was inappropriate, but "*sua sponte* construe[d] [Essien's] motion as one for a preliminary injunction." (ECF No. 7.)  The motion—like the current COVID-19 crisis—raises a number of difficult questions.  Having carefully examined the parties' submissions, the Court finds, for the reasons explained below, that a preliminary injunction should issue, releasing Essien from the Facility and subjecting him to home detention at his sister's home.

## I.  BACKGROUND[1]

Essien is a Nigerian citizen who has not had lawful status in the United States since November 1996.  (ECF No. 10 at 2.)  He was convicted in July 2009 in Colorado state court of racketeering, forgery, and theft, and sentenced to twenty-four years' imprisonment.  (*Id.* at 3.)  He was released from prison, however, in 2019, after which ICE officers detained him.  (*Id.*)  He has been in removal proceedings since then, and is being held at the Facility without bond.  (*Id.* at 3–4.)

As is well known, the novel coronavirus officially known as SARS-CoV-2, and the disease it causes, COVID-19, have led to a worldwide pandemic.  The problem became especially acute in Colorado in mid-March 2020.

As will be described in greater detail below, Essien claims he has several medical conditions that make him particularly susceptible to a severe case of COVID-19, should he contract the disease.  He fears that if the virus begins spreading within

---

[1] Much of what the Court knows about Essien derives from a declaration of his attorney after speaking with Essien on the telephone.  The Court authorized this procedure due to the difficulties of obtaining a signed declaration from Essien himself given current restrictions at the Facility which significantly, if not completely, curtail counsel's in-person access to his client. (*See* ECF No. 10 at 9; ECF No. 11.)

the Facility, he will be unable to avoid it, and will become severely ill.  He applied to ICE

for humanitarian parole, and ICE rejected that application on April 7, 2020.  (ECF No.

1-15.)

So far, there have been no confirmed cases of COVID-19 at the Facility.  (ECF

No. 10 at 9.)  However, five Facility employees have tested positive.  (*Id.* at 10.)

The Court will provide further factual findings as they become relevant to the

analysis below.

## II.  LEGAL STANDARD[2]

### A.      General Preliminary Injunction Standard

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief

must be clear and unequivocal.  *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d

1110, 1117 (10th Cir. 2010).  "A plaintiff seeking a preliminary injunction must establish

[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable

harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor,

and [4] that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20

(2008).

The Tenth Circuit previously endorsed an alternate standard that relaxed the

likelihood of success requirement when the other three factors tipped strongly in the

movant's favor.  *See, e.g.*, *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration

Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006).  The Tenth Circuit abrogated this

standard in 2016, announcing that "any modified test which relaxes one of the prongs

for preliminary relief and thus deviates from the standard test is impermissible."  *Diné*

---

[2] Although ICE disputes whether Essien may bring a habeas action (see below), ICE
nowhere argues that preliminary injunctive relief is unavailable in a habeas action.

*Citizens Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

**B.      Whether a Heightened Standard Applies**

Although the Tenth Circuit has abrogated relaxed standards, the Tenth Circuit continues to endorse a heightened standard for "[d]isfavored preliminary injunctions," which do not

> merely preserve the parties' relative positions pending trial. Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win.  To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: She must make a strong showing that these tilt in her favor.

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citations and internal quotation marks omitted).

ICE says that Essien is seeking an injunction that hits all three of the foregoing possibilities.  (ECF No. 10 at 12.)  The Court will ignore the first possibility because mandatory versus prohibitory is often a matter of semantics.  The Court agrees as to the second possibility—a change in the status quo.  "[T]he status quo [is] the last peaceable uncontested status existing between the parties before the dispute developed."  *Free the Nipple*, 916 F.3d at 798 n.3 (internal quotation marks omitted).  The last peaceable uncontested status here is Essien's detention before COVID-19 became of significant concern, and Essien is seeking to change that status.  Thus, for at least this reason, Essien must make a "strong showing" on "the likelihood-of-success-on-the-merits and

the balance-of-harms factors." *Id.* at 797.[3]

## III. ANALYSIS

### A. Likelihood of Success on the Merits

1.  Propriety of a § 2241 Action

A petition for writ of habeas corpus seeks "release from unlawful physical confinement." *Preiser v. Rodriguez*, 411 U.S. 475, 485 (1973). Congress has authorized this Court to grant the writ to a petitioner who is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(a), (c)(3).

Many courts, including the Tenth Circuit, make a distinction between, on the one hand, an attack on confinement itself, which is the appropriate object of a habeas petition, and, on the other hand, an attack on the conditions of confinement, which normally must be brought as a civil rights action under 42 U.S.C. § 1983 if against a state, or under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), if against the federal government. *See McIntosh v. U.S. Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997). In theory, these causes of action are oil and water: a habeas claim may lead to an order releasing the prisoner or detainee or nothing at all; whereas a conditions-of-confinement claimant may only lead to an order requiring the government to improve the conditions of confinement, but not an order releasing the prisoner or detainee. *See id.*

---

[3] For clarity, the Court notes that granting a preliminary injunction would not grant Essien all the relief he could expect from a "trial win." *Id.* "[A] preliminary injunction falls into the all-the-relief category only if its effect, 'once complied with, cannot be undone.'" *Id.* at 798 n.3. Here, even if the Court grants a preliminary injunction, the Court must eventually come to a final decision on Essien's habeas petition (ECF No. 1)—presumably under a more deliberate, non-emergency schedule, with better opportunities for development of evidence and argument. If, after that, the Court decides that Essien is not entitled to habeas relief, ICE could arrest and detain him again.

ICE insists that Essien attacks the conditions of his confinement because he argues that the Facility, by its layout and operation, puts him at serious risk of contracting COVID-19.  Therefore, Essien must bring a *Bivens* action.  (ECF No. 10 at 12–13.)  Essien responds that release from custody is the only effective remedy available under the circumstances because, for all practical purposes, there is no way he can avoid infection in the close-quarters, communal living arrangement that the Facility was designed to provide.  Therefore, release from custody—a uniquely habeas remedy—is the appropriate request.  (ECF No. 12 at 4–5.)

The parties both have good authority on their side, exposing a question that has received little or no discussion in the case law: What if confinement itself is the unconstitutional "condition of confinement"?  Although the question raises many interesting theoretical and philosophical questions, the Court has little time for them under the circumstances.  It must adhere to the most on-point, controlling precedent available, while acknowledging that none of the potentially applicable precedents was decided with this precise question in mind.  Recognizing that limitation, the Court finds that the Supreme Court's *Preiser* decision controls here: when a prisoner or detainee "is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus."  411 U.S. at 500.  In that light, the Court finds that Essien has properly brought a habeas petition.[4]

---

[4] ICE does not raise, and so the Court will not further explore, the question of whether the necessarily temporary character of the habeas writ Essien requests—release until, *e.g.*, the pandemic passes—is an appropriate use of the writ.

2.      "Punishment"

Federal immigration detention is a form of civil (not criminal) detention that must comply with the Fifth Amendment's Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  More specifically, the Fifth Amendment requires that the detention be "nonpunitive in purpose and effect." *Id.*; *cf. Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (stating, in the context of the Fourteenth Amendment Due Process Clause, that "due process prohibits any punishment of those awaiting trial").  If Essien is "in custody in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2241(c)(3), it is because his current detention is punitive, in violation of the Fifth Amendment Due Process Clause.

A party may prove that his or her detention is punitive in either of two ways: by showing "an expressed intent to punish on the part of detention facility officials," or by showing that "the restriction in question bears no reasonable relationship to any legitimate governmental objective." *Blackmon*, 734 F.3d at 1241(internal quotation marks omitted).  If a reasonable relationship exists, the detainee can also prove that the restriction is "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

ICE suggests that Essien must also prove that Facility officials are being deliberately indifferent to his situation.  (ECF No. 10 at 15, 18–20.)  Deliberate indifference—a subjective inquiry—is an Eighth Amendment standard under the Cruel and Unusual Punishments clause. *See Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).  With respect to prison conditions, the distinction between the Cruel and Unusual Punishments clause and the Due Process Clause has long been treated as one without a difference, *see, e.g.*, *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315

(10th Cir. 2002), but that began to change with the Supreme Court's *Kingsley* decision, *supra*.

In addressing a claim of excessive force in pretrial detention, *Kingsley* held that a pretrial detainee proceeding under the Due Process Clause need only prove that the force was unreasonable under the circumstances (an objective inquiry), in contrast to a convicted prisoner proceeding under the Cruel and Unusual Punishments Clause, who must demonstrate that the prison official used force that was unreasonable under the circumstances (objective component) and that the prison official knew or recklessly disregarded that fact (subjective component). 135 S. Ct. at 2471–76. In other words, the Supreme Court rejected any subjective inquiry in the case of pretrial detainees. It said that the "most important[]" reason for its holding was that a subjective inquiry establishes the line between constitutional and unconstitutional "punishment," whereas "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Id.* at 2475.

The reasoning in *Kingsley* holds even more true in the *civil* detention context, such as immigration detention. Moreover, in this respect, the Court sees no distinction between an excessive force claim and a conditions-of-confinement claim. There is no justification for an inquiry into a subjective state of mind. Accordingly, the only elements the Court must consider are whether there was an expressed intent to punish, whether the restriction in question bears no reasonable relationship to any legitimate governmental objective, or whether the restriction is excessive as compared to a legitimate government objective.[5]

---

[5] The Court's holding is limited only to dangerous conditions of confinement in civil detention. The Court recognizes that a denial-of-medical-care claim (sometimes categorized as a conditions-of-confinement claim) raises special concerns because eliminating the subjective component might make the government liable for mere medical negligence, yet "liability for

8

Essien does not attempt to prove an expressed intent to punish, so the Court need only focus on the second and third possibilities.  As to those, the analysis effectively overlaps with the remaining preliminary injunction elements (irreparable harm, balance of harms, and public interest).  Accordingly, the Court will analyze those elements first, before making a conclusion as to likelihood of success.

**B.    Irreparable Harm**

ICE does not dispute that the severe potential consequences of COVID-19— permanent injury or death—qualify as irreparable harms.  ICE does dispute, however, that either of these consequences is likely.  (*See* ECF No. 10 at 26–27.)

The Supreme Court "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis in original).  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id*.

Under these circumstances, the likelihood of Essien suffering irreparable harm has three factors: (1) the likelihood of the virus (SARS-CoV-2) entering the Facility; (2) the likelihood of Essien contracting the virus once it enters the Facility; and (3) the likelihood that he will develop a severe case of COVID-19.  Finally, in this context, the Court must also consider the likelihood that Essien will face less risk from COVID-19 while residing at his sister's house—a matter which goes to Article III standing, because

---

negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  The Court therefore expresses no opinion about denial-of-medical-care claims.

if Essien has nowhere safer to go, his requested relief (release from detention) will not remedy his claimed injury.

The Court will address each of these matters in turn.

1. <u>Likelihood of the Virus Entering the Facility</u>

The Facility has taken steps to lower the chance that the virus will be introduced into the inmate population. Specifically, ICE:

- screens all new detainees for symptoms of COVID-19 and isolates those with such symptoms, while placing all others in the Facility's "annex, an entirely separate building, for 14 days, where they are monitored";

- limits professional visits to non-contact visits and has suspended in-person social visitation and facility tours; and

- screens all staff and vendors when they enter the facilities, "including body temperatures and a written questionnaire."

(ECF No. 10-1 ¶¶ 9–10, 20–21.) These measures are a good start, but the Court finds that the likelihood of the virus entering the Facility is still high.

The problem for the Facility—and the whole world right now—is the virus's capacity for asymptomatic transmission. For example, on April 20, 2020, the Los Angeles County Department of Public Health released preliminary results from serological antibody testing suggesting that

> approximately 4.1% of the county's adult population has antibody to the virus. Adjusting this estimate for statistical margin of error implies about 2.8% to 5.6% of the county's adult population has [the] antibody to the virus—which translates to approximately 221,000 to 442,000 adults in the county who have had the infection. That estimate is 28 to 55 times higher than the 7,994 confirmed cases of COVID-19 reported to the county by the time of the study in early April.

News Release: USC-LA County Study: Early Results of Antibody Testing Suggest

Number of COVID-19 Infections Far Exceeds Number of Confirmed Cases in Los

Angeles County (Apr. 20, 2020), *at* http://publichealth.lacounty.gov/phcommon/public/

media/mediapubhpdetail.cfm?prid=2328 (last accessed Apr. 22, 2020).  Studies such as

this strongly suggest that most infected persons have little or no symptoms, and pass

on the virus unwittingly.

Here, although the Facility screens incoming inmates, and keeps even the

apparently healthy inmates away from the general population for fourteen days, the

Facility's only precaution as to *staff and vendors* appears to be taking their temperature

and having them fill out a questionnaire.  This is inadequate to prevent asymptomatic

transmission of the disease.

The federal Centers for Disease Control and Prevention ("CDC") recommends

wearing of cloth face coverings to prevent asymptomatic carriers of the virus from

exhaling droplets containing the virus, in turn increasing the risk of transmission to

others.  *See* Recommendation Regarding the Use of Cloth Face Coverings, Especially

in Areas of Significant Community-Based Transmission, at

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

(last accessed Apr. 22, 2020).  Essien reports, however, that he interacts with 12–15

guards over the course of a typical day, but "[m]ost" do not wear masks.  (ECF No. 12-4

¶ 16.)

Accordingly, the Court finds it likely that the virus will enter the Facility despite

ICE's efforts to prevent it.

2.      Likelihood of Essien Contracting the Virus Once it Enters the Facility

No party disputes that the most effective way of preventing infection is avoiding

interaction with those who are infected—more specifically, not touching them or the things they touch, and not breathing the air they breathe.  In a detention setting such as the Facility, maintaining such distance is, for all practical purposes, impossible.

Essien says that he and his fellow detainees spend sixteen hours a day in a 7 x 9 foot cell—usually two to a cell, although Essien is in a three-person cell.  (ECF No. 12-4 ¶¶ 5–6, 12.)  They share a toilet and a sink.  (*Id.* ¶ 7.)  Essien's cell is part of a "pod" that currently houses "about 49 total detainees."  (*Id.* ¶ 4.)  When they are allowed into a common area (for eight hours a day), the space is only "about one half [the size] of a basketball court," meaning inmates cannot realistically maintain any distance between each other.  (*Id.* ¶ 13.)  All inmates in the pod share seven shower stalls, which are cleaned once per day.  (*Id.* ¶ 10.)  Each inmate in Essien's pod has recently received one paper facemask, but the inmates do not know whether those paper masks—which are bound to wear out quickly—will be replaced.  (*Id.* ¶ 15.)[6]  And, as noted previously, guards are generally not wearing masks.  (*Id.* ¶ 16.)

Accordingly, Essien has shown a likelihood that he will contract the virus if it is introduced into the Facility.

### 3.   Likelihood that Essien Will Develop a Severe Case of COVID-19

ICE emphasizes that, according to a medical doctor's declaration submitted by Essien, "80% of the people who contract COVID-19" will experience only "a mild upper respiratory infection."  (ECF No. 10 at 25.)  Thus, in ICE's view, Essien cannot show a likelihood of irreparable harm.  (*Id.* at 25–26.)  Mr. Essien, however, displays several risk factors that make it much more likely for him to develop severe symptoms.

---

[6] In any event, the Court is unaware of any authority that a paper facemask is effective in preventing infection, as opposed to preventing infected persons from spreading it.

First, Essien has been diagnosed with hypertension since 2004, and has been taking daily medications for this condition since 2005.  (ECF No. 12-4 ¶ 2(b).)  Currently, the CDC does not specifically list hypertension as a risk factor for a severe case of COVID-19.  *See* People Who Are at Higher Risk for Severe Illness, *at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed Apr. 22, 2020) ("CDC Risk Factors").  However, evidence is rapidly mounting that high blood pressure is the most common comorbidity for persons admitted to the hospital for COVID-19 treatment.  *See* Safiya Richardson *et al.*, "Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area," *Journal of the American Medical Association* (online Apr. 22, 2020) at E3 (listing hypertension as the most common comorbidity, present in 3,026 of 5,700 cases studied, *i.e.*, 56.6%), *available at* https://jamanetwork.com/journals/jama/fullarticle/2765184 (HTML summary) *and* https://jamanetwork.com/journals/jama/articlepdf/2765184/jama_richardson_2020_oi_2 00043.pdf (PDF article) ("JAMA-NYC Study").  Essien points out that, according to the American Heart Association, a study of Wuhan, China, hospitalizations shows a 6% death rate for those with high blood pressure.  (ECF No. 4 at 9, ¶ 12.)

Second, Essien is fifty-five years old.  (ECF No. 12-4 ¶ 2.)  According to the most recent data from the Colorado Department of Public Health and the Environment, among confirmed cases of COVID-19, the 50–59 age group has a hospitalization rate of 19.67%:



(Screengrab from https://covid19.colorado.gov/data/case-data (Apr. 23, 2020 at 10:45 AM).)

Third, Essien is male.  Although less than half of known cases in Colorado are male, males make up almost 60% of those who have died:

| COVID-19 in Colorado by Sex | | |
| --- | --- | --- |
| | Cases | Deaths |
| Female | 52.04% | 39.57% |
| Male | 46.98% | 59.65% |
| Unknown | 0.98% | 0.79% |

(Screengrab from https://covid19.colorado.gov/data/case-data (Apr. 23, 2020 at 10:50 AM).)

Fourth, Essien is of black African origin.  According to Denver Public Health, as

of April 22, 2020, "Black, Non-Hispanic" individuals make up 8% of Denver's population

but 16% of those in Denver requiring hospitalization for COVID-19:



(Screengrab from https://storymaps.arcgis.com/stories/

50dbb5e7dfb6495292b71b7d8df56d0a (Apr. 23, 2020 at 11:00 AM).)[7]

Fifth, Essien has a history of recurring pneumonia, including five times in the past

ten years, and, since the 1990s, four or five hospitalizations for pneumonia, with the

most recent being in May 2019.  (ECF No. 12-4 ¶ 2(d), (f); ECF No. 16 at 1.)  The CDC

specifically lists "chronic lung disease" as a risk factor for severe cases.  *See* CDC Risk

Factors, *supra*.

Sixth, Essien was diagnosed in 2010 as "borderline diabetic."  (ECF No. 12-4

¶ 2(d).)  The above-mentioned study of New York City hospitalizations identifies

diabetes as a comorbidity in 33.8% of hospitalizations.  JAMA-NYC Study at E3.

Seventh, Essien has a body mass index of 34.85.  (ECF No. 16 at 1.)  The New

York City study found that a body mass index greater than or equal to 30 was a

---

[7] The same data shows that, at least in Denver, persons in Essien's age group have the
highest rate of hospitalization.

comorbidity in 41.7% of hospitalizations. JAMA-NYC Study at E3.

Taking all of Essien's pre-existing conditions together, the Court finds that Essien's risk of developing a severe case of COVID-19 is likely. Moreover, ICE does not dispute that, in general, those with severe cases have a 15% fatality rate, and can otherwise sustain permanent damage to the heart, kidneys, and other organs and bodily systems. (*Compare* ECF No. 4 at 10, ¶¶ 15–17 *with* ECF No. 10 at 25–26.) Essien has therefore shown a likelihood of death or permanent injury.

4.  Likelihood that Essien Will Face Less Risk at His Sister's Home

The Court has no jurisdiction over a case if the Court cannot enter an order that will redress the claimed injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). For reasons explained below, the Court finds it wholly inappropriate to issue a habeas writ that permits Essien to leave the Facility and go wherever he may please. He must go to and remain at a specific location where ICE can find him, if needed, and his risk of contracting COVID-19 must be lower in that location than in the Facility. If he has no such place to go, the habeas writ will not redress his injury.

Essien says he will go "directly" to the home of his sister in Aurora, Colorado. (ECF No. 12-4 ¶ 20.) His sister says that the home is nearly 3,000 square feet with four bedrooms. (ECF No. 15-1 ¶ 2.) It is currently occupied solely by Essien's sister and her son (*i.e.*, Essien's nephew). (*Id.* ¶ 1.) Essien would have his own bedroom. (*Id.* ¶ 13.) No one visits the home. (*Id.* ¶ 9.)

Essien's sister works as a home health aide for five clients at their places of residence. (*Id.* ¶ 5.) This gives the Court serious pause. However, for the following reasons, the Court finds that this consideration does not mean Essien is safer at the Facility:

- Essien's sister sees her clients in their homes, not at clinics or hospitals, and none so far have been suspected of COVID-19.  (*Id.*)

- She never enters a client's home without wearing gloves, a mask, and a gown to cover her clothing.  (*Id.* ¶ 6.)

- After leaving a client's home and before getting into her car, she removes the protective clothing and places it in a trash bag to be disposed of.  (*Id.*)

- When she returns home, she parks in her garage, removes all of her clothing and places it in the laundry machine, which is also in the garage. She then immediately proceeds to the shower.  (*Id.*)

- Due to her line of work, she has always been assiduous about disinfecting the home, and she is even more vigilant now.  (*Id.* ¶¶ 5, 8, 15.)

- She is Essien's sister, and therefore has a much stronger interest than the Facility in ensuring that Essien remains healthy.  (*Id.* ¶¶ 16–17.)

As for Essien's nephew, he is an author and so regularly works from home. (ECF No. 15-2 ¶ 3.)  He does not leave the house for social visits.  (*Id.* ¶ 6.)  He further says that his mother "is fanatic about disinfecting and her fanaticism has also rubbed off on me."  (*Id.* ¶ 5.)

Considering all of this together, the Court finds that Essien would be at substantially less risk of contracting COVID-19 at his sister's home than at the Facility. Thus, Essien has met his burden to show both irreparable harm and the Court's ability to enter a remedial order.

## C.   Balance of Harms & Public Interest

In analyzing whether a preliminary injunction should issue against the

government, the final two elements of the preliminary injunction test are treated together. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In general, immigration detention "gives immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity before a final decision can be made." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). Specific to Essien, ICE says, without further elaboration, that "[a]n order directing ICE to release [Essien]—given his criminal history—is also contrary to the interests of the American public." (ECF No. 10 at 26.)

Essien's criminal history is nonviolent. The Court does not mean to say that one who engages in crimes of dishonesty is never a threat to the public. Nonetheless, under the circumstances, the Court finds the character of Essien's criminal history significant.

Moreover, the Court is not releasing Essien to roam at large. As explained below, the Court will release him only into the custody of his sister and he will be required to remain under home detention, with whatever location tracking conditions ICE deems appropriate.

The government's generalized interests in ensuring the effectiveness of immigration laws via detention do not outweigh the risks that COVID-19 uniquely pose to Essien. ICE appears to want to keep Essien in detention more to prove a point about its authority to detain generally, despite COVID-19, rather than out of any consideration specific to Essien.

Thus, the balance of harms and public interest strongly favor Essien.

\* \* \*

Having made the foregoing findings, the Court returns to the question of likelihood of success.  The Court finds that Essien has shown a strong likelihood that he will succeed in proving, after a full proceeding on the merits, that his detention is currently "punitive," in violation of the Fifth Amendment.  Thus, he satisfies all four preliminary injunction elements.[8]

## D.    Bond & Other Conditions

A party awarded a preliminary injunction normally must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  This Court nonetheless has discretion in this matter.  *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987); *see also* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2954 n.29 (3d ed., Apr. 2020 update) (citing public rights cases where the bond was excused or significantly reduced).  ICE has not argued that Essien should be required to post a monetary bond, and the Court finds that waiver of a monetary bond is appropriate in any event.

---

[8] Luckily for Essien, he meets the appropriate burden on all elements.  (*See* Part II, above.)  Nonetheless, the exigencies created by the COVID-19 pandemic—where death may be at stake and the science is rapidly evolving—exposes the difficulties in the conclusion that the Supreme Court's *Winter* decision necessarily means "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  *Diné Citizens*, 839 F.3d at 1282.  This is not a universally accepted interpretation of *Winter*.  *See, e.g.*, *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010) ("flexible" preliminary injunction standard still valid, despite *Winter*).  And Judge Lucero's separate opinion in *Diné Citizens* is practically a prophecy of the present circumstances: "This common sense approach [*i.e.*, a 'sliding scale' analysis] reflects the need to provide district courts with flexibility to maintain the status quo when confronted with difficult cases that will surely result in irreparable harm."  839 F.3d at 1286 (Lucero, J., concurring in part and dissenting in part).  This remains true even apart from cases "that will surely result in irreparable harm."  There are likely many detainees whose cases are not as clear-cut as Essien's, and therefore must remain in a situation where they are being exposed to a non-negligible risk of serious illness and even death—all in the name of doctrinal rigidity.  Doctrinal rigidity is, of course, directly antithetical to the purpose of equity jurisdiction.

Nonetheless, the Court will impose non-monetary conditions, namely:

- Essien may only be released into the custody of his sister, Enoh Etuk, who must then drive him directly to her residence at 1430 Haleyville Street, Aurora, Colorado ("Residence");

- Essien shall be under home detention at the Residence—he may not leave the Residence except for necessary medical treatment and court appearances;

- Essien may not violate any federal, state, or local law;

- to the extent Essien still has possession of any passport, he must surrender it to the Clerk of this Court within one court business day after his release from the Facility; and

- ICE may employ whatever form of location monitoring it deems reasonable, including electronic monitoring (such as GPS).

ICE asks that the preliminary injunction expire "within seven days of when Colorado lifts its statewide stay-at-home order." (ECF No. 10 at 28.) Essien says that "should the Court wish to include a [return-to-the-Facility] requirement," it should be "within seven days of the COVID-19-related state of emergency being lifted by both state and federal authorities." (ECF No. 12 at 12 n.21.) The Court will not yet impose a specific condition of this type. The parties' briefing is inadequate on the topic, and there are potentially many circumstances that might tip the balance back in ICE's favor, *e.g.*, Essien contracts and survives COVID-19, a highly effective antiviral treatment is discovered, a vaccine is eventually discovered and Essien receives the vaccine, the Court decides after full merits briefing that Essien is not entitled to habeas relief, etc.

The Court does not purport to be able to predict all the possible scenarios.  Accordingly, absent the Court itself dissolving the preliminary injunction, the Court leaves it to ICE to move for its dissolution based on materially changed, legally significant circumstances.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Essien's Motion for a Temporary Restraining Order (ECF No. 4), construed as a motion for preliminary injunction (ECF No. 7), is GRANTED; and

2.    Subject to the conditions stated in Part III.D, above, Defendants, along with their officers, agents, servants, employees, and attorneys, and all others in active concert or participation with any of them, are PRELIMINARILY ENJOINED as follows: **No later than twenty-four hours from the entry of this Order**, **Defendants shall release Essien from the Facility and shall not re-detain him (at the Facility or otherwise) absent further Order of this Court.**

Entered at Denver, Colorado this 24th day of April, 2020 at 10:52 AM, MDT.

BY THE COURT:

_____
William J. Martinez
United States District Judge